IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| **SABRINA ALLEN, individually and as representative of the Estate of RAYMOND LUTHER ALLEN, and as Next Friend to AA, RA, RA and JT,** | § § § § § § | |
| **VS.** | § § | NO. 12-CV-00064 |
| **CITY OF GALVESTON, COUNTY OF GALVESTON, and TASER INTERNATIONAL, INC.** | § § § § | JURY DEMAND |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

TO THIS HONORABLE COURT:

Plaintiff SABRINA ALLEN, individually and as representative of the estate of RAYMOND LUTHER ALLEN, JR., deceased ("Mr. Allen"), and as next friend to AA, RA, RA, and JT (collectively, "Plaintiffs") and complains of Defendants THE CITY OF GALVESTON ("City"), THE COUNTY OF GALVESTON, and TASER INTERNATIONAL, INC. ("Taser International") for cause of action and respectfully show the Honorable Court the following:

### Introduction

1. The Taser is an "electro muscular disruption weapon" supposedly designed to incapacitate without causing serious physical injury or death. The Taser delivers a paralyzing 50,000 volt shock to the body through metal probes attached to twenty-one foot wires that are fired from the Taser using a nitrogen propellant. The Taser is marketed as an electronic defense weapon. It has routinely been said by experts that police should not Taser people who simply appear confused and may be slow to comply with requests. Importantly, Tasers were not

designed to be used as a first line of defense against non-dangerous or non-threatening individuals. Tasers were instead intended to be used on suspects who act out in a violent fashion, or present a danger to themselves, or others. Tasering inappropriately, as an offensive means rather than as a necessary defense to ensure the safety of the suspect, officers, and bystanders, constitutes the use of unnecessary or excessive force. Since 2001, more than 330 Americans have died after being "Tasered."

2. The Galveston Police Department has a long history of being accused of excessive force. In fact, as of 2005, there were more than fifty-four such complaints pending against the Galveston Police. The complaints of excessive force since 2005 have continued, and have been numerous and well publicized.

3. Raymond Luther Allen, Jr., as a citizen of the United States, had the right to life, liberty and the pursuit of happiness. On February 27, 2012, several Galveston County peace officers took away these rights when they, without provocation or cause, shocked Mr. Allen to death with a lethal Taser, which had been aggressively and deceptively marketed by Defendant, Taser International, Inc. Mr. Allen's life and liberty were stolen from him due to an unjustifiable lack of sufficient policies and procedures by the very municipal government supposedly there to protect him, and a manufacturer's refusal to provide adequate safeguards, or otherwise take a dangerous product off the market. Allen is survived by his wife and three children.

### Parties

4. Plaintiffs are all individual citizens of the State of Texas.

5. Plaintiff Sabrina Allen is the wife of the deceased Raymond Luther Allen, J.R.

6. Plaintiffs Alliyah Allen, Rayvin Allen, Raymond Allen and Jonisha Tisino are all children of the deceased Raymond Luther Allen, J.R.

7. Defendant City of Galveston controls and is responsible for the actions of the Galveston Police Department and its officers. The City is a municipal corporation operating pursuant to the Constitution and the laws of the State of Texas. The City of Galveston may be served through its City Secretary. It is the City of Galveston's customs, practices and policies, or lack thereof, that contributed to Mr. Allen's death. Further, the City's deliberate indifference to the need for adequate training also contributed to Mr. Allen's death.

8. Defendant County of Galveston controls and is responsible for the actions of the Galveston Sheriff's Department and its deputies. The County operates pursuant to the Constitution and the laws of the State of Texas. The County of Galveston may be served through the County Attorney. It is the County's customs, practices and policies, or lack thereof, that contributed to Mr. Allen's death. Further, the County's deliberate indifference to the need for adequate training also contributed to Mr. Allen's death.

9. Defendant Taser International, Inc. is a foreign corporation with its principal place of business in Arizona. Taser International, Inc. may be served with process via its registered agent for service of process, CT Corporation System, 239 E. Camelback Road, Phoenix, AZ 85016.

## Jurisdiction

10. This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. §1331 because at least one of Plaintiff's claims arises under the Constitution and laws of the United States.

11. Venue is proper pursuant to 28 U.S.C. §1391(a) (2) in that Plaintiffs' claims arise from events taking place within this judicial district, and this division.

## Statement of Facts

12. On February 27, 2012, a Galveston Police Officer and Galveston Sherriff's Deputy ("officers") received a report that a man had twice jumped from the second story of the Beachcomber Inn on 61st Street in Galveston, Texas. Officers responded to the report and encountered Mr. Allen at a restaurant next to the motel, sitting on the curb.

13. According to multiple reports, the officers were initially concerned for Mr. Allen's safety, and asked Allen if they needed to call an ambulance. Based on his erratic behavior, the officers believed that Allen was under the influence of drugs. Unfortunately, concern for Mr. Allen's well-being quickly morphed into aggression. When Allen demonstrated behavior that was perceived by the Officers to be nonresponsive and noncompliant, rather than check his medical condition or deal with him in a less aggressive manner, the officers instead proceeded to hogtie and shock Mr. Allen multiple times with their Tasers. The Tasers were supplied by their respective employers and manufactured by Taser International, Inc.

14. Mr. Allen at no time threatened the officers. At no time was Mr. Allen violent. At no time were the officers ever in danger. None had a reasonable concern for their safety, Mr. Allen's safety, or the safety of others.

15. Mr. Allen suffered from cardiac arrest as a result of being shocked by the Tasers, and was declared dead at the University of Texas Medical Branch two days later.

16. Most police forces across the country have formalized training in the use of Tasers. Galveston County and the City of Galveston do not. Such training typically requires that officers be certified before they are authorized to use Tasers. They also require that users and instructors be recertified periodically (usually every year for users and every two years for instructors).

17. Neither the County of Galveston nor the City of Galveston have adequate polices or procedures in place in the use of Tasers. Many other police forces do. Such Taser use protocols include several key tenants, including:

    a. Police should not Taser people who simply appear confused and may be slow to comply with requests.

    b. Tasers are not to be used as a first-line of defense against non-dangerous or non-threatening individuals.

    c. Tasers are only to be used on suspects who act out in a violent fashion, or present a danger to themselves, or others.

    d. Tasering inappropriately, as an offensive means rather than as a necessary defense to ensure the safety of the suspect, officers, and bystanders, is unnecessary.

18. And, most policies include the following guidance permitting the use of Tasers only in the following instances:

    a. when a person exhibits violent or potentially violent behavior that threatens the safety of others and attempts to subdue by conventional means have been or appear too unlikely to be effective;

    b. when it is unsafe to get within contact range of the subject;

    c. when the use of deadly force is justified and an opportunity exists to use the Taser, deploy the Taser if available; and

    d. to restore or maintain order during prison disturbances;

    e. to restore or maintain order during very violent civil disturbances where innocent people may be rescued or where police are confronted with a level of force likely to cause serious physical injury such as Molotov cocktails being thrown or dangerous weapons or instruments are being used; or

    f. to subdue vicious animals.

19. The International Association of Chiefs of Police ("IACP") recommends that a police force have in place a policy on the use of Tasers that, at the least, concerns the following factual situations:

a. fleeing suspects and, if so, under what circumstances;

b. persons with known or visible impairments indicating compromised health;

c. mentally challenged persons or vulnerable populations (such as children, the elderly, and pregnant women); or

d. people to force compliance.

20. The IACP also recommends that departments have in place comprehensive training programs on electronic defense weapons, including testing, certification, and recertification procedures. IACP also recommends that before arming officers with the weapons, departments should ensure that officers achieve technical proficiency in the use of the weapons and understand department policies and procedures governing them. According to the IACP, instructors should teach officers about:

a. the capabilities and limits of the technology in terms of its effectiveness;

b. the need for sound justification when discharging the weapons;

c. proper incident-reporting procedures; and

d. the manufacturer's guidelines for maintaining and calibrating weapons to ensure that they perform as intended with regard to (a) incapacitating a target and (b) recording incidents for report verification and validation purposes.

21. The IACP further recommends that instructors lessons include:

a. lessons and "simulations structured for situations where less-lethal force options are chosen";

b. "hands-on exercises using test cartridges and foil targets that simulate human subjects";

c. "scenario-based exercises"; and

d. written tests.

22. Excited delirium is a condition that manifests as a combination of delirium, psychomotor agitation, anxiety, hallucinations, speech disturbances, disorientation, violent and bizarre behavior, insensitivity to pain, elevated body temperature, and superhuman strength. Excited delirium arises most commonly in male subjects with a history of serious mental illness and/or acute or chronic drug abuse, particularly stimulant drugs such as cocaine. Alcohol withdrawal or head trauma may also contribute to the condition.

23. Many police departments also have policies prohibiting the use of Tasers on those suspected of being under the influence of drugs, or in a state of excited delirium. This is because it is known that the risk of death from a Taser shock increases when an individual is under the influence of certain drugs, or in a state of excited delirium. Galveston has no such policy.

24. As of 2005, there were at least fifty-four complaints of police misconduct against the Galveston Police Department. Indeed, the Galveston Police Department has a history of condoning and/or ratifying the excessive force of its police officers. As examples, on August 22, 2006, Officer David Roark and Office Sean Steward received reports that there were three Caucasian prostitutes soliciting in the neighborhood. Officers Roark and Steward jumped out of an unmarked van and grabbed a twelve year old girl who they mistakenly believed to be a prostitute. The officers proceeded to beat her and hit her in the back of the head with a flashlight despite there being no provocation for the same. On information and belief, the officers were not disciplined for using excessive force, indicating ratification and acceptance of patterns, practices, customs and/or procedures of the excessive use of force.

25. In 2007, there were reportedly nine instances of police using excessive force within a six-month period of time, causing the Galveston County Coalition for Justice to sponsor a public

forum to instigate a federal investigation into the matters.[1] Some other instances of excessive force alleged at the public forum included: 1) the police beating of Patrick James Woods while handcuffed on a Galveston Area Street on May 8, 2005; and 2) Officers kicking and striking Odell Parish in the head after another reveler tried to start a fight with him during the 2005 Mardis Gras Parade.[2] On information and belief, none of the officers involved in the above 11 instances were disciplined for using excessive force, indicating ratification and acceptance of patterns, practices, customs and/or procedures of the excessive use of force.

26.	In 2008, a total of 20 police officers became involved in an altercation stemming from a 19 year old wedding attendee's attempt to enter the hosting hotel's pool area with a container of alcohol.[3] His attempts to enter the pool area led the police to taser both the 19 year old and his father, despite lack of provocation.[4] While the officers were disciplined for "failures," the Galveston Police Department never disciplined the officers for the use of excessive force,[5] indicating a ratification and acceptance of patterns, practices, customs, and/or procedures for the excessive use of force.

27.	Taser International Inc. was founded in 1993. In 1994 the non-firearm Taser was developed, which allowed it to bypass federal and state laws governing firearms. By 1998 the company began marketing the Taser to police departments and law enforcement agencies and private buyers who had previously bought Tasers for personal protection.

28.	Tasers and stun guns are high-voltage, low-amperage devices that cause involuntary muscle contractions, loss of body control, and extreme pain and fatigue. The Taser

---

[1] *See* http://www.chron.com/news/houston-texas/article/Galveston-activists-allege-police-brutality-1675152.php (last visited March 7, 2012).
[2] Id.
[3] *See* http://abclocal.go.com/ktrk/story?section=news/local&id=6717542 (last visited March 7, 2012).
[4] Id.
[5] Id.

delivers a paralyzing 50,000 volt shock to the body through metal probes attached to 21-foot wires that are fired from the Taser using a nitrogen propellant. When the Taser is fired, the probes penetrate the skin or up to 1" of clothing per probe to deliver a shock.

29. The use of Tasers have been linked to various physiological affects including cardiac arrest, respiratory failure, malfunction of pacemakers, damaged eyes, injury to the central nervous system and death. Furthermore, use of Tasers has been linked to miscarriage when used on a pregnant woman.

30. Since 2001, more than 330 Americans have died after being "Tasered" and at least one pregnant mother has lost her unborn child. From 2002 to 2005, 211 children were shocked with Tasers in the United States and one 14-year-old boy in a Chicago children's home had a heart attack after police used a Taser on him.

31. Taser International has been criticized for aggressive marketing tactics, including misrepresenting the dangers of its product and subtly encouraging its use in improper situations. Furthermore, company officials have publicly claimed that a Department of Defense study was "independent" proof of the Taser's safety—even though Taser International provided most of the research material used in the study and participated in three panels to determine the scope of the study, analyze data, and review findings.

32. More than fifty-nine wrongful death lawsuits have been filed against Taser International since the Taser went on the market.

## Causes of Action

**A. 42 U.S.C. § 1983, and Violations of the 4th and 14th Amendments to the United States Constitution—Unconstitutional Custom, Policy, or Practice—City of Galveston and County of Galveston.**

33. Defendant City of Galveston and Defendant County of Galveston deprived Plaintiff's decedent of his fourth and fourteenth amendment rights to freedom from excessive force and freedom from bodily intrusion by failing to provide proper supervision, policy, and/or training to prevent the officers' use of excessive force, as described *supra*.

34. Additionally, the City of Galveston and the County had a general policy, custom, pattern and/or practice of not disciplining police officers for the use of excessive force, thereby sanctioning the police and sheriff officers' actions, which amounted to deliberate indifference.

35. The City of Galveston and the County also had an unconstitutional policy, or custom or practice, whereby they would use Tasers on nonviolent, nonthreatening individuals, when such individuals posed no threat to the officers, bystanders, or even themselves. The application of such policy, or lack thereof, caused Plaintiff's death.

36. The City of Galveston and the County had an unconstitutional custom or practice of using Tasers on those nonviolent and nonthreatening individuals under the influence of drugs, or in the state of excited delirium. The application of such custom or practice caused Plaintiff's death.

37. Defendants are liable for the constitutional torts of their officers, as described *supra*, because Defendants sanctioned the following customs, practices or polices, or acted with deliberate indifference to the officers' conduct:

(A) Using excessive force to carry out otherwise routine arrests or stops, contrary to written policy and consistent with and tacitly approved custom or practice;

(B) Using deadly force when such force is not necessary or permitted by law;

(C) Ignoring the serious need for training and supervision of officers regarding the use of force, despite being aware of numerous other incidents;

(D) Ignoring the serious need for training and supervision of officers regarding the use of taser weapons;

(E) Failing to adequately supervise and observe its officers;

(F) Failing to adequately train officers regarding the availability of alternative means of detaining persons other than through the use of force or deadly force;

(G) Failing to adequately train officers regarding the proper use of taser weapons, including the risks involved in their use.

38. At the time officers tased Mr. Allen, they were acting pursuant to an official City and County policy, practice, custom and procedure overlooking and/or authorizing police officers' use of force. The City and the County acted with deliberate indifference to either the lack of a policy, or the custom and practice of ignoring any such policy in place.

39. As a result, the City's policy of overlooking and covering up police brutality was a direct cause of Plaintiff's injuries. In particular, the City's policy caused deprivation of Mr. Allen's constitutional right to be free from objectively unreasonable, excessive force or intrusion under the Constitution of the United States.

**B. Strict Products Liability—Marketing Defect and Design Defect-–Taser International, Inc.**

40. At all material times, Defendant Taser International was responsible for designing, manufacturing, producing, testing, studying, inspecting, labeling, marketing, advertising, selling, promoting and/or distributing the Tasers that caused Mr. Allen's death.

41. Taser International failed to conduct adequate testing and research and failed to conduct adequate marketing surveillance, to determine the safety of the Taser weapons, including with respect to the causal connection between the use of Taser weapons on individuals and the risk of death. Specifically, due to the design of the product, there is a risk of cardiac arrest even when properly used. And, there is a higher risk of death when the Taser is used on particular parts of the body, or when used on individuals under the influence of drugs, or in a state of excited delirium. Taser did not pass this information on to the end user.

42. Taser International failed to disclose on its warning labels or elsewhere that adequate pre-marketing testing and research and adequate post-marketing surveillance, had not been done. Taser International knew or should have known that, at all material times, its communications about the risks and adverse effects of its stun guns, including labels, advertisements and promotional materials, were materially false and misleading, and/or inadequate. In the alternative, the Taser International was ignorant of whether or not its communications about the stun guns were true in material ways, but continued recklessly to market its products.

43. Taser International's nondisclosures and misrepresentations as alleged herein were material, and were substantial factors that contributed directly and causally, and naturally and necessarily, to the serious injuries and damages that Mr. Allen has suffered.

44. Taser International should have instructed and warned end users that a Taser should be utilized only in cases of self-defense and the defense of others and that it is never to be used as a compliance tool, and that its use may cause serious injury and/or death.

45. Thus, Defendant Taser International's Taser product is defective in that it is capable of an electrical shot that can cause death and serious bodily injury as opposed to the non-

lethal and non-harmful shock that it is advertised to provide. Indeed, the Taser in fact did cause personal injuries to Mr. Allen while being used in a manner reasonably foreseeable, thereby rendering the product unsafe and dangerous for use in its intended manner.

46. Further, Taser International's product is unreasonably dangerous and defective for use on human beings because, among other reasons, it was sold without warnings as to the effect of multiple shocks, the danger of shocking people who are under the influence of drugs, and the effects of Taser shocks on respirations such that the weapon, when used in combination with chest compression techniques cause unnecessary deaths.

47. Further, Defendant Taser International sold Taser weapons to law enforcement agencies, such as City, without adequate warning of training in its potential for causing death and great bodily injury.

48. As alleged above, Officers shocked Mr. Allen repeatedly while he was in an irrational and delirious state. As a direct and proximate result of the aforementioned conduct by Taser, alone and in combination with the wrongful conduct of City as alleged above, plaintiffs were injured and sustained damages as alleged herein, including the killing of decedent Mr. Allen.

49. Plaintiffs are informed and believe thereon allege that Taser International acted in a despicable, malicious, and oppressive manner, in conscious disregard of the rights of Mr. Allen and other people whom they knew, or reasonably should have known, were likely to be shocked with the Taser weapon by law enforcement officers not adequately warned or trained about the extreme and unreasonable danger of this product, and that such weapons posed a risk of serious bodily injury or death to people such as Mr. Allen.

50. Based on the facts, Taser International knew that the Taser weapon could not be used safely for the purposes for which it was intended, and that this weapon was defective and dangerous, but despite that knowledge, in conscious disregard for the safety of the public, Taser International placed this product on the market without warning customers or the unknowing public of the defects and dangers, and knew when it did so that this weapon would be sold to and used by law enforcement agencies without adequate knowledge of its defects and dangers, and expressly and impliedly represented that it was safe for the purposes for which it was intended. In doing the aforementioned, Taser International was guilty of malice and oppression and despicable conduct, and plaintiffs are therefore entitled to recover exemplary and punitive damages to be determined at trial.

**Prayer**

For these reasons, Plaintiffs ask that Defendants be cited to appear and answer, and that they have judgment against Defendants for the following:

a. Compensatory damages in an amount to be determined according to proof at trial, but sufficient to compensate for the loss of a husband, and father;

b. All damages pursuant to the Texas Wrongful Death Act, pursuant to Tex. Civ. Prac.& Rem. Code Ch. 71, to decedent's spouse, Sabrina Allen, individually, and as next friend to decedent's children, AA, RA, RA, and JT.

c. All damages pursuant to the Texas Survival Statute, pursuant to Tex. Civ. Prac. & Rem. Code Ch. 71, to decedent's estate.

d. Costs of suit necessarily incurred herein;

e. Attorney's fees and costs pursuant to 42 U.S.C. 1988;

f. Exemplary damages against Taser International in an amount sufficient to make an example of Taser International and to deter future misconduct; and

g. Such further relief as the Court deems just or proper.

Respectfully submitted,

**THE PINKERTON LAW FIRM, PLLC**

　*/s/ C. Chad Pinkerton*_____
**C. Chad Pinkerton**
Texas State Bar No. 24047199
Federal ID No. 1068659
5020 Montrose Blvd, Suite 550
Houston, Texas 77006
713-360-6722 (office)
713-360-6810 (facsimile)
www.chadpinkerton.com

CERTIFICATE OF SERVICE

I certify that opposing counsel is a known user of the Court's electronic filing system and that service of this document will be made through that system.

             */s/ C. Chad Pinkerton*