IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| SABRINA ALLEN, individually and as representative of the Estate of RAYMOND LUTHER ALLEN, and as Next Friend to AA, RA, RA and JT, | § § § § § § | |
| VS. | § § | NO. 3:12-CV-00064 |
| CITY OF GALVESTON, COUNTY OF GALVESTON, and TASER INTERNATIONAL, INC. | § § § § | |

**Defendant TASER International, Inc.'s Motion to Dismiss
Plaintiff's Second Amended Complaint and Brief in Support**

Defendant TASER International, Inc. ("TASER") moves this Court pursuant to Federal Rule of Civil Procedure 12(b)(6) to Dismiss Plaintiffs' Second Amended Complaint ("Complaint") with prejudice as against TASER.

Plaintiffs bring two strict liability claims against TASER: one for design defect and one for marketing defect. Both claims fail. First, Plaintiffs' design defect claim is insufficiently pled because it does not identify what TASER product is at issue, nor does it identify a safer alternative design that would significantly reduce the alleged risk of injury or death without substantially impairing the product's utility. Second, Plaintiffs' marketing defect claim fails because TASER's law enforcement product warnings and training specifically capture the *exact circumstances* alleged by Plaintiffs in this case.

I.  BACKGROUND.

On February 27, 2012, Galveston law enforcement officers were called after Mr. Raymond Luther Allen, Jr., ("Mr. Allen" or "Decedent") twice jumped from the second story of

the Beachcomber Inn on 61st Street in Galveston, Texas. (Dckt. 16 at ¶ 12).[1] Upon the officers' arrival Mr. Allen continued to act erratically, and the officers "shock[ed] Mr. Allen multiple times with their Tasers." (*Id.* at ¶ 13). Apparently Mr. Allen was under the influence of drugs or suffering from "excited delirium." (*Id.* at ¶¶ 13, 22, 23, 36, 41 & 46). Excited delirium is defined as:

> [A] widely accepted entity in forensic pathology and is cited by medical examiners to explain the sudden in-custody deaths of individuals who are combative and in a highly agitated state. "Excited delirium" is broadly defined as a state of agitation, excitability, paranoia, aggression, and apparent immunity to pain, often associated with stimulant use and certain psychiatric disorders. The signs and symptoms typically ascribed to "excited delirium" include bizarre or violent behavior, hyperactivity, hyperthermia, confusion, great strength, sweating and removal of clothing, and imperviousness to pain. Speculation about triggering factors include sudden and intense activation of the sympathetic nervous system, with hyperthermia, and/or acidosis, which could trigger life-threatening arrhythmia in susceptible individuals. Carolyn B. Robinowitz, MD, REPORT OF THE COUNSEL ON SCIENCE AND PUBLIC HEALTH 453 (AMERICAN MEDICAL ASSOCIATION, ANNUAL MEETING 2009).

*See Mann v. TASER International, Inc.,* 588 F.3d 1291, 1299, fn. 4, (11th Cir. (Ga.) 2009).

According to Plaintiffs, "Mr. Allen suffered from cardiac arrest as a result of being shocked by the Tasers, and was declared dead at the University of Texas Medical Branch two days later." (Dckt. 16 at ¶ 15). On May 16, 2012, Plaintiffs filed their Second Amended Complaint naming the City of Galveston, Galveston County, and TASER as defendants. With respect to TASER, Plaintiffs assert strict products liability claims for marketing defect and design defect, as well as a claim for punitive damages. (*Id.* at Count B). They specifically allege:

- TASER "failed to conduct adequate testing and research and failed to conduct adequate marketing surveillance, to determine the safety of the Taser weapons, including with respect to the causal connection between the use of Taser weapons on individuals and the risk of death." (*Id.* at ¶ 41).

- "[D]ue to the design of the product, there is a risk of cardiac arrest even when properly

---

[1] TASER assumes the allegations in the Complaint are true for purposes of this motion only.

used. And, there is a higher risk of death when the Taser is used on particular parts of the body, or when used on individuals under the influence of drugs, or in a state of excited delirium. Taser did not pass this information on to the end user." (*Id.*)

- TASER "should have instructed and warned end users that a Taser should be utilized only in cases of self-defense and the defense of others and that it is never to be used as a compliance tool, and that its use may cause serious injury and/or death. (*Id.* at ¶ 44).

- TASER's product is defective because "it is capable of an electrical shot that can cause death and serious bodily injury as opposed to the non-lethal and non-harmful shock that it is advertised to provide. Indeed, the Taser in fact did cause personal injuries to Mr. Allen while being used in a manner reasonably foreseeable, thereby rendering the product unsafe and dangerous for use in its intended manner." (*Id.* at ¶ 45).

- TASER sold weapons to the City of Galveston "without adequate warning or training in its potential for causing death and great bodily injury." (*Id.* at ¶ 47).

Plaintiffs' allegations against TASER are sweeping generalizations devoid of meaningful facts. Most glaringly Plaintiffs fail to identify *what* TASER product was allegedly used on Mr. Allen. There is no such thing as a "Taser." TASER® is a registered trademark, not a product. TASER manufactures and sells several different handheld electronic control device ("ECD") models for use by law enforcement, including the TASER® M26™ ECD, the TASER® X26™ ECD, the TASER® X2™ ECD, and the TASER® X3™ ECD. (See http://www.taser.com/products/law-enforcement). Significant differences exist between each model.

Plaintiff also fails to state *how* the unidentified TASER ECD was allegedly used on Mr. Allen (TASER ECDs can generally be used in "drive stun," "probe mode," or "three-point deployment mode," and each mode has different expected physiologic effects and probabilities of effectiveness of use in achieving an officer's force objectives) [2]; how many times it was

---

[2] A TASER X26 ECD can be used in either "drive-stun" mode or dart mode. *See Brooks v. City of Seattle,* 599 F.3d 1018, 1026 (9th Cir. 2010). The use of "drive-stun" mode involves touching the TASER to the body and causes temporary, localized pain only. *Id.* The use of the device in dart mode (wherein two probes are shot at a suspect from some distance) achieves greater

allegedly used; *where* (and in what mode) on Mr. Allen's body it was allegedly used; or the length of the alleged deployments. Also, while Plaintiffs make several sweeping allegations that TASER failed to adequately test its product, they fail to offer any facts supporting this conclusion, (i.e., what testing was done, why that testing was inadequate, what testing should have been done, and what results would allegedly have been discovered through that testing). Finally, Plaintiffs fail to allege the essential element for stating a design defect claim: that a safer alternative design existed that would reduce the risk of injury without substantially impairing the product's utility.

      Plaintiffs' allegations with respect to marketing defect are also vague and conclusory, but they suffer from an additional flaw: TASER's product warnings capture the *exact circumstances* complained of by Plaintiffs. In contradiction to Plaintiffs' allegation that TASER failed to warn "of its potential for causing death and great bodily injury" (Dckt. 16 at ¶¶ 47 & 49), the relevant warnings, which were published and made publically available on TASER's website on November 30, 2011, include the following warning label which specifically states "Can cause death or serious injury":



---

distance between the contact nodes which can cause neuro-muscular incapacitation. *Id.* The two methods for deploying the TASER X26 ECD have markedly different physiological effects. *Id.,* at fn. 12.

*See* http://www.taser.com/product-warnings; *see also* Product Warnings at "Exhibit A."

As this Court has already held in a case involving almost identical allegations, TASER's product warnings are adequate as a matter of law to warn about the risk of injury or death on susceptible individuals who exhibits signs of excited delirium. *See Carroll v. Harris County, Tex.*, No. H–08–2970, 2011 WL 2457935, at *5 (S.D. Tex. May 25, 2011); report and recommendation of Magistrate Froeschner adopted by Judge Miller in *Carroll v. Harris County, Tex.* No. H-08-2970, 2011 WL 2457517 (S.D.Tex. Jun 16, 2011).

## II. STANDARDS GOVERNING A MOTION TO DISMISS.

### A. Motion to Dismiss Standard.

While there are no special pleading requirements for product liability claims in general, a plaintiff must allege sufficient facts to meet the "plausibility" standard in *Iqbal* and *Twombly*. *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009), *Bell Atlantic Corp. v. Twombly*, 550 US 544, 555, 127 S.Ct. 1955, 1964 (2007). It is not enough simply to allege that a wrong has been committed and demand relief; the underlying requirement is that a pleading give "fair notice" of the claim being asserted and the "*grounds* upon which it rests." *Twombly*, 550 US at 555 (internal quotes omitted); *Swierkiewicz v. Sorema N.A.*, 534 US 506, 513, 122 S.Ct. 992, 998 (2002).

To establish a "plausible" claim, the complaint must contain "more than labels and conclusions" or "formulaic recitations of the elements of a cause of action." *Twombly*, 550 US at 555. "While legal conclusions can provide the framework of a complaint, *they must be supported by factual allegations*." *Iqbal*, 129 S.Ct. at 1950 (emphasis added) (rejecting conclusory allegations). Here, Plaintiffs fail to allege sufficient facts to infer plausible claim of design and marketing defect.

### B. This Court Can Take Judicial Notice of Documents Whose Content are Alleged in the Complaint and are Central to Plaintiffs' Claims or Matters of Public Record.

Generally, in considering a Rule 12(b)(6) motion, a district court must limit itself to the contents of the pleadings, including the attachments thereto; however, there are exceptions to this rule. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000), *Sheppard v. Texas Dep't Transp.*, 158 F.R.D. 592, 595 (E.D. Tex. 1994). Various circuits have specifically allowed that "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Collins*, 224 F.3d at 498-99; *See in Limon v. Berryco Barge Lines, L.L.C.*, 2010 WL 5333957 (Tex. 2010) (the Fifth Circuit made it clear that such a consideration is generally limited to "documents that are referred to in the plaintiff's complaint and are central to the plaintiff's claim."); *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003).

Although the Fifth Circuit has not articulated a test for determining when a document is central to a plaintiff's claims, case law suggests that "documents are central when they are necessary to establish an element of one of the plaintiff's claims." *Kaye v. Lone Star Fund V (U.S.). L.P.*, 453 B.R. 645, 662 (N.D. Tex. 2011); *Franks v. Prudential Health Care Plan, Inc.*, 164 F.Supp.2d 865, 872 (W.D. Tex. 2001) ("[D]efendant tenders the documents as exhibits to its motion to dismiss and these documents allegedly directly refute the complaint's assertions […] [t]herefore this court considers […] defendants' document plan exhibit in determining whether Mr. Franks' complaint states a claim upon which relief may be granted.").

A court may refer to matters of public record when deciding a Rule 12(b)(6) motion to dismiss. *Lewkut v. Stryker Corp.*, 724 F.Supp.2d 648, 653 (S.D. Tex. 2010). Furthermore, "it is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record."

*Kaye*, 453 B.R. at 664. Here, Plaintiffs make numerous market defect allegations concerning the "inadequacy" of TASER's product warnings, most notably with respect to the alleged risks that TASER's products have on humans. (Dckt. 1 at ¶ ¶ 41, 45, 46, & 49). Additionally, TASER's warnings are available on TASER's public website; thus, making them a matter of public record. Accordingly, a true and correct copy of TASER's law enforcement product warnings that were in effect on November 30, 2011 are attached as "Exhibit A" to this memorandum and can be considered by this Court without converting TASER's motion to one for summary judgment.

### III. ARGUMENT

#### A. Strict Products Liability Under Texas Law.

Strict product liability claims for defective products are commonly classified as claims for manufacturing, design, or marketing defects. *USX Corp. v. Salinas*, 818 S.W.2d 473, 482 & n.8 (Tex. App.—San Antonio 1991, writ denied). In order to establish a claim for strict liability the plaintiff must prove (1) the defendant places the product into the stream of commerce, (2) the product was defective, (3) the product reached the consumer without substantial change in its condition from the time it was originally manufactured/sold, (4) the defect rendered the product unreasonably dangerous, and (5) the unreasonably dangerous defect caused the plaintiff injury. *Davis v. Conveyor-Mantic Inc.*, 139 S.W.3d 423, 429 (Tex. App.—Fort Worth 2004, no pet.).

A defective product is a product that is unreasonably dangerous to the user or consumer. *See Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 665 (Tex. 1999). A product is unreasonably dangerous when, whether by reason of design or marketing defect, it is dangerous to an extent beyond that which would be contemplated by an ordinary user of the product, with the ordinary knowledge common to the community as to that product's characteristics. *Syrie v. Knoll Int'l*, 748 F.2d 304, 306 (5th Cir. 1984).

### B. Plaintiffs' Marketing Defect Claim Fails as a Matter of Law Where TASER's Product Warnings and Training Explicitly Capture the Alleged Circumstances.

Count B of the Second Amended Complaint asserts a claim for "Strict Products Liability—Marketing Defect." A marketing defect occurs when a defendant knew or should have known of a potential risk of harm presented by its product but markets it without adequately warning of the danger or providing instructions for safe use. *Dewayne Rogers Logging, Inc. v. Propac Indus., Ltd.*, 229 S.W.3d 374, 384 (Tex. App.—Tyler 2009, pet. Filed). To sustain a marketing defect claim, the plaintiff must plead and prove (1) a risk of harm inherent in the product or that may arise from the intended or reasonably anticipated use must exist, (2) the product supplier must actually know or should have reasonably foreseen the risk at the time the product is marketed, (3) the product must contain a marketing defect, (4) the absence of a warning or instruction must render the product unreasonably dangerous, and (5) the failure to warn or instruct must constitute a causative nexus to the plaintiff's injury. *Wright v. Ford Motor Co.*, 508 F.3d 263, 275 (5th Cir. 2007); *Painter v. Momentum Energy Corp.*, 271 S.W.3d 388, 410 (Tex. App.—El Paso 2008, pet. Denied); *see also Blackmon v. American Home Prods. Corp.*, 346 F. Supp. 2d 907, 916 (S.D. Tex. 2004) (plaintiff must show both that warning was defective and that it was cause of injury).

Here, Plaintiffs' marketing defect claims rest on their allegations that TASER failed to adequately warn or train law enforcement in its potential for causing great bodily injury or death. (Dckt. 16 at ¶¶ 47 & 49). While Plaintiffs generically criticize TASER's ECD product warnings, they fail to identify the actual provisions they consider inadequate, and they fail to state what alternative warnings should have been given. Regardless, Plaintiffs' general allegations are contradicted by TASER's product warnings and training and, in some instances, Plaintiffs' own Complaint.

### i. TASER's Warnings Capture the Exact Risks Complained of By Plaintiffs.

Plaintiff alleges the TASER ECD is "unreasonably dangerous and defective for use on human beings because… it was sold without warnings as to the effect of multiple shocks, the danger of shocking people who are under the influence of drugs, and the effects of Taser shocks on respirations…" (Dckt. 1 at ¶ 46), and that TASER "sold Taser weapons to law enforcement agencies, such as City, without adequate warning of [sic] training in its potential for causing death and great bodily injury" (Dckt. 1 at ¶ 47). In fact, TASER warns of these exact risks:

## Safety Information: ECD Known and Potential Side Effects

⚠️ **WARNING**

 Always follow and comply with all instructions, warnings, information, and current TASER training materials to reasonably minimize the risks associated with possible Use and side effects listed below.

 **Physiologic or Metabolic Effects**
The ECD can produce physiologic or metabolic effects which include, but are not limited to, changes in: acidosis; adrenergic states; blood chemistry, blood pressure; calcium, creatine kinase ("CK"); electrolytes (including potassium); lactic acid; myoglobin; pH; respiration; heart rate, rhythm, capture; stress hormones or other biochemical neuromodulators (e.g., catecholamines). Therefore, reasonable efforts should be made to minimize the number of ECD exposures and resulting physiologic and metabolic effects. In human studies of electrical discharge from a single ECD of up to 15 seconds, the effects on acidosis, CK, electrolytes, stress hormones, and vital signs have been comparable to or less than changes expected from physical exertion similar to struggling, resistance, fighting, fleeing, or from the application of some other force tools or techniques. Adverse physiologic or metabolic effects may increase risk of death or serious injury.

 **Physiologically or Metabolically Compromised Persons**
Law enforcement personnel are called upon to deal with individuals in crisis who are often physiologically or metabolically compromised and may be susceptible to arrest-related death ("ARD"). The factors that may increase susceptibility for an ARD have not been fully characterized but may include: a hypersympathetic state, autonomic dysregulation, capture myopathy, hyperthermia, altered electrolytes, severe acidosis, cardiac arrest, drug or alcohol effects (toxic withdrawal or sensitization to arrhythmias), alterations in brain function (agitated or excited delirium), cardiac disease, pulmonary disease, sickle cell disease, and other pathologic conditions. These risks may exist prior to, during, or after law enforcement intervention or ECD use, and the subject may already be at risk of death or serious injury as a result of pre-existing conditions, individual susceptibility, or other factors. In a physiologically or metabolically compromised person any physiologic or metabolic change may cause or contribute to death or serious injury. Follow your agency's Guidance when dealing with physiologically or metabolically compromised persons.

 **Higher Risk Populations**
ECD use on a pregnant, infirm, elderly, small child, or low body-mass index ("BMI") person could increase the risk of death or serious injury. ECD use has not been scientifically tested on these populations. The ECD should not be used on members of these populations unless the situation justifies possible higher risk of death or serious injury.

 **Stress and Pain**
The ECD can cause temporary discomfort and pain which may result in stress, panic, anger, rage, or startle which may be injurious to some people and may cause adverse changes in blood chemistry. Additionally, anticipation of ECD exposure can cause stress, trepidation, panic, startle, or fear, which may also be injurious to some people.

## Safety Information: ECD Deployment and Use

> ⚠️ **WARNING**


**Minimize Repeated, Continuous, or Simultaneous[10] Exposures**
Reasonable efforts should be made to minimize the number of ECD exposures. ECD users should use the lowest number of ECD exposures that are objectively reasonable to accomplish lawful objectives and should reassess the subject's behaviors, reactions, and resistance level before initiating or continuing the exposure. If subject is non-compliant after a number of ECD exposures, consideration should be given to whether alternative control measures in conjunction with or separate from the ECD are appropriate under the circumstances.


**Control and Restrain Immediately**
Begin control and restraint procedures, including restraining the subject during ECD exposure, as soon as reasonably safe and practical to do so in order to minimize total ECD exposure. The ECD user, and those individuals assisting the user, should avoid touching the probes, wires, and the area between the probes to avoid accidental or unintended shock during ECD electrical discharge.


**Other Conditions**
Unrelated to ECD exposure, conditions such as excited delirium, severe exhaustion, drug intoxication or chronic drug abuse, and/or over-exertion from physical struggle may result in death or serious injury. Accordingly, it is advisable to use expedient physical restraint to minimize the overall duration of stress and exertion particularly on individuals exhibiting symptoms of superhuman strength, excited delirium and/or exhaustion.

*See* Exhibit A at pages 2 - 4.

As this Court previously noted, where the warnings or instruction provided specifically mention the circumstances complained of, the warnings or instructions are deemed to be adequate as a matter of law. *See Carroll,* 2011 WL 2457935, at *5. In *Carroll,* the Plaintiff's decedent died after an altercation with Harris County Sherriff's Deputies which involved physical restraint and the use of a TASER X26 ECD. *Id.* at *1. The medical examiner's report noted the "Cause of Death" as "Sudden death during schizophrenic psychotic delirium following physical restraint." *Id.* Like Plaintiffs in this matter, Carroll sued TASER for strict liability alleging that TASER placed "in commerce a product that failed in its intended purpose, to-wit: advertised as a 'less-lethal weapon.'" *Id.* Carroll further alleged "that how TASER markets the device 'lulls officers into a false sense of safety and causes the multiple and repeated use of the product.'" *Id.* This Court rejected Plaintiff's allegations and granted summary judgment:

> **Taser's warnings were adequate, as a matter of law, to warn of the circumstances of this case.** In particular, Taser warned officers that the use of the taser involves physical incapacitation and that 'it is important to remember that the

> very nature of use of force and physical incapacitation involves a degree of risk that someone will get hurt **or may even be killed due to physical exertion, unforeseen circumstances and individual susceptibilities**.' . . . **Taser further warned that 'prolonged or continuous' exposure should be avoided because, in susceptible people the stress and exertion of repeated applications could contribute to exhaustion, stress and associated medical risks. Taser warned that susceptible people could include those who exhibited signs of excited delirium, severe exhaustion, drug intoxication or chronic drug abuse, and/or over-exertion from physical struggle; and further warned that increased exhaustion or stress in these individuals may result in serious injury or death.** Given the adequacy of Taser's warnings, all of which were provided to the Harris County Sheriff's Office before the incident in question, Plaintiffs' claim of a marketing defect (failure to warn) fails.

(*Id.* (emphasis added)); see also *Marquez v. City of Phoenix*, No. CV–08–1132–PHX–NVW, 2010 WL 3342000, *7 (D. Ariz. August 25, 2010) (TASER's warnings adequate as a matter of law).

Here, as in *Carroll,* Plaintiffs' allegations fail in the face of TASER's comprehensive product warnings. For example, Plaintiffs allege that TASER ECD use carries a higher risk when used on particular parts of the body, or when used on individuals under the influence of drugs, or in a states of excited delirium, and that "Taser did not pass this information on to the end user" (Dckt. 16 at ¶ 41; see also ¶ 46), yet TASER's warnings carry a "**Sensitive Body Part Hazard**" warning on page 4, and multiple warnings about ECD use on persons physiologically or metabolically compromised by drug use and/or excited delirium on page 2 **("Physiologically or Metabolically Compromised Persons")** and page 4 **("Other Conditions")**.

Likewise, Plaintiff alleges that TASER ECDs were "sold without warnings as to the effect of multiple shocks" (Dckt. 16 at ¶ 46), yet TASER's warnings contain a **"Minimize Repeated, Continuous, or Simultaneous Exposures"** warning on page 4.

Finally, Plaintiffs allege that TASER didn't instruct users that ECDs "may cause serious injury and/or death" (Dckt. 16 at ¶¶ 44 & 47), yet page 1 of TASER's product warnings contain

a "Warning label" carrying the exact words: "Can Cause Death or Serious Injury." Thus even a cursory review of TASER's warnings contradicts all of Plaintiffs' claims.

Finally, assuming *arguendo* that TASER did not warn about the risks associated with ECD use on individuals under the influence of drugs or in a state of excited delirium, Plaintiffs' own Complaint alleges that the risk is open and obvious. "Many police departments also have policies prohibiting the use of [ECDs] on those suspected of being under the influence of drugs, or in a state of excited delirium. This is because it is known that the risk of death from a [TASER ECD] shock increases when an individual is under the influence of certain drugs, or in a state of excited delirium." (Dckt. 16 at ¶ 23). Because *Plaintiffs* allege the risk of ECD use on susceptible individuals is "known" in the law enforcement community, TASER cannot be held liable for failure to warn. To-wit, there is "no duty to warn when the risks associated with a particular product are matters 'within the ordinary knowledge common to the community.'" *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 384 (Tex. 1995) (citing *Joseph E. Seagram & Sons, Inc. v. McGuire,* 814 S.W.2d 385, 388 (Tex.1991)). For all of these reasons Plaintiffs' marketing defect claim fails and should be dismissed with prejudice.

### ii. Plaintiffs' Complaint Concedes that TASER's Allegedly Defective Training Program was not the Cause of Plaintiffs' Injuries.

Plaintiffs allege that TASER sold its weapons to law enforcement without adequate training, and that TASER acted in a "despicable, malicious, and oppressive manner" because it knew people would be shocked by "officers not adequately warned or trained about the extreme and unreasonable danger" of the product. (Dckt. 16 at ¶¶ 47 & 49). In fact, TASER offers an industry leading, comprehensive ECD training and certification program for use by law enforcement agencies. *See* http://www.taser.com/training/taser-training. Further, TASER's warnings also state:

## Important ECD Product Safety and Health Information

These warnings are for your protection as well as the safety of others.[1,2] Disregarding this information could result in death or serious injury.

### ⚠ WARNING

**Complete Training First**
Significant differences exist between each of the TASER International, Inc. ("TASER") Electronic Control Device ("ECD") models. Do not use[3] or attempt to use any ECD model unless you have been trained and certified by a Certified TASER Instructor[4] on that particular model.

**Read and Obey**
Read, study, understand, and follow all instructions, warnings, information, training bulletins and TASER training materials[5] before using TASER ECDs. Failure to comply with these instructions, warnings, information, training bulletins, and TASER training materials could result in death or serious injury to the user, force recipient, and others.

**Obey Applicable Laws, Regulations, and Agency Guidance**
Use ECDs only in accordance with applicable federal, state, and local laws and other regulations or legal requirements. Your law enforcement agency's Guidance[6] must also be followed.[7] Any ECD use must be legally justifiable. Resistance to law enforcement interaction often incurs substantial risk of death or serious injury and subjects who resist law enforcement assume all such risks of death or serious injury.

*See* Exhibit A at page 1.

TASER's product warnings unequivocally state that TASER ECD users are to complete TASER training before using a TASER ECD. However, as TASER states in footnote 6 of its warnings, "TASER has no power or authority to mandate or require Guidance, set policy, require training, or establish standards of care or conduct." (Exhibit A). Regardless, Plaintiffs do not offer *any facts* identifying what is defective or inadequate about TASER's formalized ECD training program. *See Twombly*, 550 US at 555 (to establish a "plausible" claim, the complaint must contain "more than labels and conclusions" or "formulaic recitations of the elements of a cause of action"). But even if Plaintiffs did identify specific deficiencies in TASER's training program, Plaintiffs' own Complaint alleges that Galveston County and the City of Galveston do not have any formalized training in the use of TASER ECDs. Thus some unidentified defect in TASER's ECD training program cannot have been the causative nexus to the plaintiffs' injury, and Plaintiffs' marketing defect claim fails accordingly. *See Wright,* 508 F.3d at 275.

**C. Plaintiffs Have Failed to Plead Facts Sufficient to State a Plausible Strict Liability Claim for Design Defect.**

Count B of the Complaint also asserts a claim for "Strict Products Liability—Design Defect." A design defect exists where a condition of the product renders it unreasonably dangerous, taking into consideration the utility of the product and the risk involved in its use. *Hernandez v. Tokaw Corp.*, 2 S.W.3d 251, 257 (Tex. 1999). To sustain a design defect claim, a plaintiff must prove that a safer alternative design existed in order to establish that the product was unreasonably dangerous as designed. Tex. Civ. Prac. & Rem. Code Ann. § 82.005(a)(1); *see Smith v. Aqua-Flo, Inc.*, 23 S.W.3d 473, 477 (Tex. App.-Houston [1st Dist.] 2000, pet. Denied) (if no evidence is offered that a safer design existed, product is not unreasonably dangerous as a matter of law). A safer alternative design means a product design other than the one in question that in reasonable probability would have prevented or significantly reduced the risk of injury without substantially impairing the utility of the product and was economically and technologically feasible at the time of the manufacture or sale of the product in question by the application of existing or reasonably achievable scientific knowledge. Tex. Civ. Prac. & Rem. Code Ann. § 82.005(b).

A product with a design defect complies with all design specification, but the design configuration is unreasonably dangerous because of the risk of harm associated with its intended and reasonable use. *Sims v. Washex Mach. Corp.*, 932 S.W.2d 559, 562 (Tex. App.—Houston [1st Dist.] 1995, not writ). A design defect focuses on the product itself, and whether safer designs were available. *Id*. Texas law does not require a manufacturer to destroy the utility of its product in order to make it safe. *Caterpillar, Inc. v. Shears*, 911 S.W.2d at 384.

Here, Plaintiffs do not even allege the existence of an alternative design, much less a safer alternative design that would significantly reduce the risk of death without substantially

impairing the product's utility. This is fatal to their design claim. *See Smith,* 23 S.W.3d at 477.

However, even if Plaintiffs did sufficiently allege the existence of an alternative design, their claim that the (unidentified) TASER weapon is "unreasonably dangerous" is unsupported in fact and contradicted by case law. First, while Plaintiffs argue that the weapon was "inadequately tested" (Dckt. 16 at ¶ 41), they fail to state what testing was done, why that testing was inadequate, what testing should have been done, or what results allegedly would have been discovered through that testing. These types of vague, conclusory allegations are insufficient to state a claim. *See Iqbal*, 129 S.Ct. at 1950.[3]

Plaintiffs' argument that the TASER ECD is "unreasonably dangerous" because it is "capable of an electrical shot that can cause death and serious bodily injury as opposed to the non-lethal and non-harmful shock that it is advertised to provide" (Dckt. 16 at ¶ 45), is not only factually unsupported but is directly contradicted by TASER's product warnings.[4] (See Exhibit A). Likewise, Plaintiffs' sweeping generalization that the benefits of TASER ECDs are outweighed by their risks is directly contradicted by case law. "We explicitly 'recognize the important role controlled electric devices like the TASER X26 can play in law enforcement' to 'help protect police officers, bystanders, and suspects alike.'" *Bryan v. MacPherson,* 630 F.3d 805, 815 (9th Cir. (Cal.) 2010) (*internal citation omitted*).

---

[3] Plaintiffs' generic claims of inadequate testing also appear ignorant to the fact that TASER ECDs have been extensively tested by TASER as a manufacturer and by the scientific and medical community. Resources regarding scientific and medical testing of TASER ECDs, including an ECD Research Index listing approximately 400 ECD related entries, is available to the public on TASER's website at: http://www.taser.com/research-and-safety/science-and-medical.

[4] Notably, several courts have actually held that ECDs are "non lethal" weapons. *Rocha v. Schroeder*, 283 Fed.Appx. 305 (5th Cir. (Tex.) 2008) (TASER ECD is not lethal force); *Fils v. City of Aventura*, 647 F.3d 1272 (11th Cir. (Fla.) 2011) (TASER ECD is a "non-deadly" weapon).

Ultimately, Plaintiffs allege *no facts* from which this court can infer that a design defect existed in the subject (albeit unidentified) TASER brand product. Rather, when the Complaint is stripped of its conclusory allegations, it states no more than Mr. Allen died after twice jumping off a second floor balcony, acting erratically, and allegedly being exposed to one or more TASER ECDs during his arrest. Because Plaintiffs fail to plead facts sufficient to support a plausible design defect claim, the claim should be dismissed.

**D. Plaintiffs Have Failed to Plead Facts Sufficient to meet the Standards for Punitive Damage Claims.**

Under Texas law, whereas every tort involves conduct that the law considers wrong, punitive damages are proper only in the most exceptional of cases. *C & D Robotics, Inc. v. Mann*, 47 S.W.3d 194, 201 (Tex. App. 2001), *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 18 (Tex. 1994). Exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from: (1) fraud; (2) malice; or (3) gross negligence. Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a) (West). "To be 'malicious,' for purposes of awarding exemplary damages, an act not only must be unlawful, but it must also be of a wanton and malicious nature, or somewhat of a criminal or wanton nature." *C & D Robotics, Inc.*, 47 S.W.3d at 201. When proof of an allegation must be clear and convincing, even evidence that does more than raise surmise and suspicion will not suffice unless it is capable of producing a firm belief or conviction that the allegation is true; evidence of lesser quality is, in legal effect, no evidence. *Southwestern Bell Telephone Co. v.* Garza, 164 S.W.3d 607, 621 (Tex. 2004), *JSC Neftegas-Impex v. Citibank, N.A.*, 2011 WL 480931 (Tex. App. 2011).

Plaintiffs' Complaint for punitive damages alleges, "[TASER] International was guilty of malice and oppression and despicable conduct, and plaintiffs are therefore entitled to recover

exemplary and punitive damages…" (Dckt. 1 at ¶ 50). Here, for all the reasons that Plaintiffs' other claims fail, Plaintiffs' claims for punitive damages are likewise insufficiently plead as against TASER. Most notably, Plaintiffs' complaint fails on its face to allege facts establishing that the several unidentified TASER ECDs allegedly used against Mr. Allen were "unreasonably dangerous," that some defect in the ECDs was a direct and proximate result of Plaintiffs' injuries, or that there existed any defect in the ECD warnings. In other words, viewing all of the evidence in the light most favorable to Plaintiffs, there exist no clear and convincing evidence in Plaintiffs' Complaint to support a firm belief that TASER engaged or acted in "wanton and malicious" conduct. Therefore, Plaintiffs' punitive damage claims are insufficient under the standard pleading requirements, and should be dismissed by this Court.

## IV. CONCLUSION.

WHEREFORE, Defendant TASER International, Inc. requests that the Court enter an Order dismissing Plaintiffs' Second Amended Complaint without leave to amend, and grant all relief it deems fair and just.

Respectfully submitted,

<u>s/ Keith A. Robb with permission</u>
**Douglas D. Fletcher**
**Attorney in Charge**
State Bar No. 07139500
Southern District Bar No. 56262
**Keith A. Robb**
State Bar No. 24004889
Southern District Bar No. 988078
**FLETCHER, FARLEY,**
**SHIPMAN & SALINAS, L.L.P.**
8750 N. Central Expressway, 16th Floor
Dallas, Texas 75231
(214) 987-9600
(214) 987-9866 (Facsimile)

**ATTORNEYS FOR DEFENDANT**
**TASER INTERNATIONAL, INC.**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been served electronically by ECF filing, mailed, telecopied or hand-delivered to all attorneys of record, in compliance with the Rules of Federal Procedure, on this the 29th day of June, 2012.

<u>/s/ Keith A. Robb</u>
Keith A. Robb